**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE NO.** |
| | : | **1:13-CR-190-SCJ-AJB** |
| **JEFFREY JAMES SMITH,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES MAGISTRATE JUDGE'S ORDER**
**<u>AND FINAL REPORT AND RECOMMENDATION</u>**

### I.    *Introduction*

The government has the burden to prove by a preponderance of the evidence that a warrantless search was lawful under the Fourth Amendment.  In this case, the government's two witnesses gave testimony that was both internally inconsistent and inconsistent with one another.  As a result, the Court concludes that the government did not satisfy its burden.

Jeffrey James Smith ("Smith" or Defendant) is charged in a five-count indictment with possession of a firearm affecting commerce following felony convictions (Count One); possession with intent to distribute cocaine (Count Two), 1-(3-Triflouromethylphenyl) Piperazine (TFMPP) (Count Three), and Marijuana (Count Four); and possession of a firearm in furtherance of at least one of

the drug trafficking crimes charged in Counts Two through Four (Count Five).  Smith

has moved to suppress evidence seized from him and his vehicle on April 30, 2011,

which evidence gave rise to the instant charges.  [Doc. 13].[1]  The Court held an

evidentiary hearing, [Doc. 21 (hereinafter T__)], after which the parties filed

briefs. [Doc. 24, 28 (United States), 27 (Smith)].[2]  With briefing concluded, the motion

to suppress is ripe for a recommended disposition.

The challenged search followed a traffic stop based on a suspended vehicle

registration.  The government contends that it was reasonable for the police officers to

extend the traffic stop because they smelled the scent of marijuana emanating from the

vehicle.  Smith does not challenge the validity of the traffic stop, but only whether the

officers had reasonable suspicion to extend the traffic stop beyond the issuance of a

---

[1]   At the evidentiary hearing, Smith withdrew his motion to suppress statements, [Doc. 14]. [Doc. 21 at 92].

[2]   Smith objected to the government's reply as untimely.  [Doc. 29].  In its response, the government states that it did not receive Defendant's brief until January 31, 2014, because the U.S. Attorney's Office was closed January 29 and 30, 2014, due to inclement weather, and the government did not move to enlarge the time allowed under the Court's January 17, 2014, Order, [Doc. 26], setting a revised briefing schedule.  Instead, the government seeks an extension of time such that its February 10 filing is deemed timely, [Doc. 30].  Defendant did not respond to the government's request.  [*See* Dkt.].  Treating Defendant's objection as a motion to strike, [Doc. 29], the Court exercises its discretion and deems the government's reply timely filed and thus **DENIES** the construed motion to strike.

2

citation, or probable cause to search his vehicle.  He also does not challenge the discovery of a firearm and controlled substances on grounds independent of an unlawfully prolonged traffic stop.  For the reasons that follow, the Court agrees with Smith that the government has not proven that the police officers smelled marijuana either before the end of the traffic stop or at any time thereafter, and therefore they had no permissible reason to further detain or search him or his vehicle.  As a result, the undersigned **RECOMMENDS** that the motion to suppress, [Doc. 13], be **GRANTED**.

## II.     *Facts*

### A.     *Undisputed Facts*

The following facts are undisputed, or are found by the Court.  At 5:52 p.m. on April 30, 2011, then-DeKalb County Police Department ("DKPD") Officer Courtney Sutherland[3] stopped a white 2005 Chevrolet Malibu driven by Smith because the registration on the vehicle was suspended.  T8, 77.  Prior to directing the Malibu to stop, Sutherland had determined that the registration was suspended by running the license plate on the National Crime Information Center database ("NCIC").  T8, 14, 15.

---

[3]        At the time of the evidentiary hearing, Sutherland was employed by the Dallas (Texas) Police Department and was seeking paralegal certification at Southern Methodist University.  She was a DeKalb County police officer from January 2010 until February 2013.  T6.  She testified that as a police officer, she seized marijuana and other drugs and thus became familiar with the odor of raw marijuana.  T7.

3

Smith pulled his vehicle into a Citgo gas station and parked next to the gas pumps. Sutherland pulled in behind the Malibu. T65. A female passenger, later identified as Katherine Durden,[4] also was in the Malibu. T8. Sutherland was in uniform and in her marked police car. T7.

Sutherland approached the driver's side of the vehicle, explained to Smith the reason for the stop, and asked for Smith's driver's license, which he produced. T15, 20, 43. The front windows of the Malibu were down. T42. Sutherland saw that Durden was smoking a cigarette. T16.[5] This portion of the encounter lasted one to two minutes. T22-23. After examining the license, Sutherland returned to her

---

[4]      Durden and Smith were engaged as of the evidentiary hearing. At the time of the events on April 30, 2011, they had been dating for about one year. T76.

[5]      In her post-incident report, Sutherland wrote that she also observed a scale on the front driver side floor board. Govt. Ex. 8 at 2. However, at the evidentiary hearing, Sutherland did not testify about observing a scale, although she acknowledged that she looked into the vehicle as she approached in order to see if there was any contraband in plain view. T19. Therefore, the Court does not rely on this portion of the written narrative in determining whether the officers had either reasonable suspicion to prolong the traffic stop or probable cause to search the vehicle. However, as discussed *infra* at 31-32, Sutherland's failure to testify at the evidentiary hearing that she observed the scale impacts the Court's credibility determination.

4

police vehicle and at 5:55 p.m. began writing a suspended license citation and checking for warrants.  T15, 32.[6]

DKPD Officer D.A. Asberry[7] was on patrol in the area of the gas station when he stopped to provide back-up assistance to Sutherland.  T15; *see also* T49, 55. Asberry also was in uniform and driving a marked police vehicle.  T48.  The traffic stop had lasted between eight and ten minutes by the time Asberry arrived.  T16, 65.  He saw that the passenger was smoking a cigarette.  T57.

Sutherland again approached the Malibu to issue the citation to Smith.  T16, 60. Sutherland stood at the driver's side, while Asberry went to the rear passenger window. T27.  Sutherland did not lean into the vehicle.  T44.  By this time, Durden had extinguished the cigarette.  T41, 59.

---

[6]    The evidence is disputed whether Sutherland also obtained Durden's identification.  *Compare* T22 (Sutherland denying she obtained Durden's identification) *with* T78 (Durden testifying that Sutherland also obtained her identification). Resolution of this conflict is not necessary for the undersigned to recommend a resolution of the pending motion.

[7]    As of the time of the incident described in the text, Asberry had been employed by DKPD for about thirteen years.  At the time of the hearing, he was a sergeant and member of the SWAT team.  He also had been a patrol officer and had been assigned to narcotics enforcement in a number of task forces or units, and as a result of his experience, he was familiar with the smell of raw marijuana.  T47.

Sutherland testified that at some point shortly thereafter she smelled marijuana coming from the Malibu.  However, as detailed below, exactly at what point during the encounter she smelled marijuana—if she did indeed smell marijuana during this encounter—is not clear.  Asberry also testified that he smelled marijuana, but, as discussed below, it is unclear when—or if—he did.  At some point, the officers switched positions, with Asberry going to Smith's side of the Malibu and Sutherland going to Durden's side. T51.  Sutherland testified that Smith was asked if he had any drugs in the vehicle and denied that he had any.  T9.   Asberry testified that after the officers switched positions, he advised Smith and Durden that they (the officers) smelled marijuana, and that he asked Smith and Durden if there were any drugs or firearms in the Malibu and whether the officers could search the car.  T51, 60, 63-64.[8] Smith denied having any firearms or drugs in the vehicle and refused to allow the officers to search.  T9, 51.  Asberry then contacted the canine unit to bring a drug detection dog to the scene.  T9, 52.

Smith and Durden were removed from the Malibu in preparation for the canine to sniff it.  T10, 52. Asberry frisked Smith and then Sutherland frisked Durden for

---

[8]      The minor discrepancy in Sutherland and Asberry's description of the questions posed to Smith and Durden are not relevant to resolution of the issues in this case.

6

weapons.  T10, 52-53, 54.  Asberry discovered a loaded firearm magazine in Smith's right front pocket.  *Id.*  Asberry asked Smith where was the weapon that went with that magazine, and Smith replied that it was in the vehicle between the driver's seat and the console.  T11, 53.[9]  Asberry entered the vehicle and seized the weapon, which contained another loaded magazine.  T11, 53-54.

DKPD Officer Summe and his dog Rocky[10] arrived ten to twelve minutes after Smith refused to consent to the search request (approximately twenty-five minutes after the traffic stop commenced).  T9, 17, 51-52.  Rocky alerted on the outside of the driver's side of the Malibu, and as a result, the driver's door was opened and Rocky was placed inside the vehicle.  T11-12.  Rocky then alerted to the area under the driver's seat.  T12.  Asberry and Sutherland searched under the seat, and Sutherland located a small plastic bag of green leafy material (which later tested positive for

---

[9]    Smith also volunteered that he was a convicted felon.  T53.

[10]    Smith stipulated to Rocky's qualifications to detect the odor of narcotics. T67.

AO 72A
(Rev.8/8
2)

marijuana),[11] a small bag containing a white powdered substance, and ten pills.  T12.[12]

Smith was arrested and transported to jail at 7:30 p.m., and the vehicle was impounded.

T13.[13]

### B.    Disputed Facts

The officers' testimony was internally inconsistent on certain material facts, and

on certain other material facts, their testimony conflicted.

1(a).  First, and foremost, both officers gave internally inconsistent testimony as

to when they first detected the smell of marijuana.  Sutherland first testified on direct

examination that she was "going to issue the citation, and smelled the smell of

marijuana."  T16.[14]  Then, on cross-examination, she first reiterated that upon her

---

[11]    The marijuana was discovered to weigh approximately sixteen grams.
T21.

[12]    Sutherland denied that she would have been unable to smell such a
relatively small sample, stating that the odor she detected either was emitted from the
marijuana located in the vehicle or from a larger quantity that was previously in the
vehicle.  T29-30.

[13]     Durden was not arrested.  T17, 91.  She called a friend who picked her up
at the scene.  T91-92.

[14]    In the Court's view, one of the reasons the officers' testimony was unclear,
as described in the text, was due to the use of the term "issuing the citation," or its
equivalent, which lack of clarity was exacerbated by the questions posed by counsel.
That is, "issuing" a traffic citation may include all of the following non-exclusive steps:
filling out the citation, explaining the citation to the driver (including the reasons for

second contact with the vehicle (i.e., after she returned from her police vehicle with the intent to serve the citation upon Defendant), she detected a "strong" odor of raw or unburnt marijuana. T21. Then, in more detail, during cross-examination, she testified that once she returned to the Malibu, while still holding the ticket, T33, she explained to Smith the reason for the citation, T25, and then provided him "advice on how to handle the citation." T26, 33 (meaning, in part, explaining to him the date he had to appear in court). Sutherland handed Smith the citation to sign, which he did, and then he returned the signed citation to her.[15] T26; *see* Deft. Ex. 1. Sutherland then tore off his copy of the citation and handed it to him. T26. She testified that up to this point, she had not smelled any marijuana. T26-27; *see also* T30 (Sutherland testifying that "up until the point [she] issued the citation," she did not smell marijuana).

However, on redirect examination, Sutherland testified that "[a]t the same time where I am talking to him and telling him the reason for the ticket and how to take care

---

the citation and how the driver can challenge or otherwise respond to it), having the driver acknowledge receipt of the citation by signing a copy of it, and serving it upon the driver. All of these actions may be part of the citation-issuing process, but when the term is used interchangeably and inexactly to describe actions better described by specific terms, particularly where the sequence of events is critical, the result is confusion and lack of clarity. Of course, to the extent there was any confusion over the use of the term, it was the government's job to clear it up.

[15]     Sutherland also returned Smith's driver's license. T26.

of it, I'm also able to smell and detect," agreeing that at that point she had not "finally handed him the ticket." T33. Then, on re-cross examination, she testified as she had on direct examination that she smelled marijuana while she was talking to Smith about the citation. T35-36, 36-37 ("I was in the process of issuing it, telling him what he was being cited for, the court date, and if he wanted to take care of the ticket and having him sign," and instead of stopping the citation-issuing process upon smelling marijuana, she continued to complete the issuance of the citation).

In summary then, Sutherland testified that she first smelled marijuana coming from the Malibu (1) when she returned to the Malibu to issue the citation, (2) after she handed Smith his signed copy of the citation, and (3) while she was talking to Smith but prior to handing him the citation. While there might only be a subtle difference between the first and third statements, the first statement implies that Sutherland smelled marijuana earlier in the encounter than the third statement.

1(b). Like Sutherland, Asberry's testimony about when he first smelled the odor of marijuana was not consistent. First, he testified on direct examination that once Durden put out her cigarette,[16] while Asberry was located on the passenger side of the Malibu, he "actually noticed a smell of green - - what we call green raw marijuana

---

[16]    Neither officer testified seeing Smith smoking a cigarette.

coming from the inside of the vehicle." T49.  However, on cross-examination, Asberry testified that he did not smell marijuana until he went to Smith's side of the Malibu, after Sutherland had issued the citation to Smith.  T69.  Then, on re-direct examination, he acknowledged that the supplemental report he wrote reflected that he smelled marijuana when he was on Durden's side of the Malibu.  T70; *see* Gov't Ex. 8.  Thus, Asberry's testimony contained two different versions of when he first smelled marijuana, and neither he nor the government explained the reason for the inconsistency.

2.  Although both officers testified that Asberry told Sutherland that cigarette smoke was commonly used to mask the odor of marijuana, their testimony about that conversation diverged considerably.  Sutherland testified that she was still filling out the citation in her vehicle when Asberry arrived.  T23.  She stated that Asberry exited his vehicle and came to her vehicle, where she advised him that the reason for the traffic stop was Smith's suspended registration.  T16, 23, 56.  Sutherland testified that at this time, unsolicited by anything she stated to Asberry and while she was still in her vehicle, Asberry told her that cigarette smoke is commonly used to mask the smell of marijuana.  T39-40, 43-44.

11

Asberry's testimony was different.  He testified that while Sutherland was still "issuing the [traffic] citation," she joined him at the rear of the Malibu and told him that when she was issuing the citation she smelled marijuana, and it was at that point he explained to her than in his experience, "people will light cigarettes or cigars, things like that, to try to mask the odor of marijuana from their vehicle."  T50.  It is not clear from this testimony whether Sutherland took a break from the encounter with Smith involving the citation, or had completed the traffic citation portion of the encounter at the time.  *See* item 6 *infra*.  Regardless, Sutherland's testimony on this point was considerably different from Asberry's.

3.  The officers's testimony also significantly differed in their descriptions of Smith's demeanor.  Asberry testified that while Sutherland finished her paperwork in her vehicle, he remained on the passenger side of the Malibu, between the front and rear doors, engaging Smith and Durden in general conversation, including about where they were coming from and their destination, in order "to make them feel more at ease."  T50, 58-59, 63.  By this time, Durden had stopped smoking the cigarette.  T59.  Asberry was close to the interior of the vehicle, although his head was not inside the Malibu.  T58.  Asberry observed that Smith appeared "pretty nervous," stating that he saw Smith's chest "rise and fall like he was -- actually his heart palpitations, watching

12

them rise and fall, he's becoming extremely nervous." T50.[17]  Asberry then testified

that "I actually told [Sutherland] that once she came back up, to make sure she kept an

eye on him because I didn't know what reason, like I said, for safety reasons to keep

an eye on him because he was seeming like he was nervous about something." T50.

In contrast, Sutherland described Smith as compliant with her directions.  She

testified that he did not offer any additional information and made minimal eye contact,

but she described it as an "average stop." T43.  She did not testify about any

nervousness on the part of Smith.  *See* Evidentiary Hearing Transcript.  Furthermore,

Sutherland described no verbal contact with Asberry after her initial meeting with him

at her police car, stating only that subsequent to that, they were not having verbal

communication, only "possible eye contact." T27.

5.  Sutherland testified that, upon smelling marijuana, she asked Smith whether

he had any drugs in the car, but then she acknowledged on cross-examination upon

being shown her post-arrest report that it was Asberry who posed that question to

Smith.  T9, 37.  Asberry also testified that he asked Smith whether he had any drugs

(and weapons) in the vehicle.  T50-51.

---

[17]    Asberry testified that Durden also was nervous, but not as nervous as
Smith.  T66.

6.  As noted in item 2 *supra*, Asberry did not clearly testify about the occurrence and chronology of certain events and conversations with Sutherland, and thus while his testimony was generally more detailed than Sutherland's, his testimony does not satisfy the government's burden either.   For example, Asberry testified on re-cross examination that after Sutherland "issued the citation" that Sutherland came to the rear of the Malibu and they concurred about the odor of marijuana.  *See* T71-72.  However, earlier he testified on cross-examination that once Sutherland "issued the traffic citation" to Smith and the officers switched positions at the rear of the Malibu, he could not recall whether he and Sutherland had a conversation at the rear of Smith's vehicle. T61.  He also testified about conversing with Sutherland after she issued the citation, but he denied that this conversation occurred when the officers crossed paths while going to opposite sides of the Malibu.  T73.[18]

Further facts will be discussed where necessary in the Discussion section.

---

[18]     Smith called Durden as a witness in his case.  *See* T76-82.  Her testimony differed from the officers' in several respects, however, the Court does not rely on her testimony to find that the officers' testimony was not sufficient to carry the government's burden.

14

### III.   *Contentions of the Parties*

Since the government bore the burden of proof, the Court assigned it the opening brief.  The government argues that the stop was not impermissibly prolonged because in the course of Sutherland issuing the traffic citation, Sutherland and Asberry both smelled marijuana emanating from inside the vehicle.  [Doc. 24 at 9].  Therefore, it argues, because the officers had reasonable suspicion that marijuana was in the vehicle, they officers properly (1) asked  Smith if he had any weapons or drugs; (2) asked for consent to search the vehicle; (3) requested a narcotics detection canine to come the scene; (4) had the canine conduct a sniff of the vehicle which resulted in the canine alerting to the driver's side door and the driver's seat; and (5) searched the vehicle and recovered the drugs.  [*Id.*].  It also contends that the duration of the stop (twenty-five minutes according to the government, thirty-to-forty-one minutes according to Smith) was reasonable since the Eleventh Circuit has upheld even longer stops.  [*Id.* at 10 (citations omitted)].

The government next argues that Asberry had reasonable suspicion that permitted him to frisk Smith for weapons, given that the officers smelled marijuana and Smith appeared overly nervous.  [*Id.*].  It then argues that the vehicle was properly searched because the officers' detection of the smell of marijuana gave rise to probable cause

15

sufficient to justify the search of the vehicle.   [*Id.* at 10-14].   Alternatively, the government argues that even if the frisk was unlawful and the Court concludes that the officers' smelling marijuana did not give rise to probable cause to search the vehicle, the firearm and controlled substances inevitably would have been found once the drug-detecting canine alerted, and the firearm magazine would have been found during a search of Smith incident to his lawful arrest.  [*Id.* at 15-16].

In his response, Smith argues that the police officers' testimony about smelling marijuana lacked credibility and trustworthiness, and as a result, they were not authorized to extend the traffic stop beyond the investigation of and citation for the suspended registration.   Therefore, he argues, the discovery of the firearm and controlled substances is tainted and must be suppressed from his trial.  [Doc. 27 at 1-2].

In support, amongst arguments about inconsistencies that either do not exist or are irrelevant,[19] Smith argues that Sutherland gave at least three different accounts of

_____

[19]     For example, Smith argues that Sutherland never asked Asberry for back-up assistance, [Doc. 27 at 4-5], but that testimony is not contradicted by other testimony in the record.  Nor is there sufficient evidence in the record for the Court to assess Smith's argument that her failure to call for back-up was "a contradiction in the behavior of an experienced and trained officer."  [*Id.* at 5].  In any event, Smith does not demonstrate how this testimony adversely implicates Sutherland's credibility.

Further, Smith argues that Sutherland's credibility is somehow compromised because she testified that she could not recall exactly what Asberry asked

16

when she smelled marijuana: before "issuing the citation" (presumably before handing Smith his copy of the signed citation), after "issuing" the citation (presumably after handing him his copy of the signed citation), and simultaneously while explaining the citation and issuing it. [*Id.* at 4, 5]. He also contends that Sutherland was not credible because she testified that both officers asked whether there were any drugs in the Malibu and could they search it, but later she admitted that only Asberry asked these questions, [*id.* at 4; *see* T37].

Next, Smith contends that Sutherland's testimony about when she first detected the marijuana smell is not credible because although she testified she smelled it before she issued the traffic citation to Smith, she did not question Smith about the marijuana smell until after she issued the citation. [*Id.* at 4-5]. He also submits that Sutherland testified inconsistently about when Asberry offered advice about the use of cigarette

---

Smith. [*Id.* at 8]. The Court does not agree that Sutherland's testimony (or lack thereof) about the conversation between Smith and Asberry implicates *her* credibility. Since he does not make any argument as to how this example reflects on Asberry's credibility, the Court will not further address this claim.

Smith also argues that Sutherland's credibility is suspect because she testified on cross-examination that the odor of marijuana was "strong," a description she did not use at any other time during her testimony. [*Id.* at 4]. However, the Court observes that Sutherland described the marijuana odor as "strong" in her post-arrest report. Govt. Ex. 8. The Court does not find that this contention undermines Sutherland's credibility.

AO 72A
(Rev.8/8
2)

smoke to mask marijuana odor.  [*Id.* at 5-6].  Finally, he argues that contrary to Asberry's testimony, Sutherland did not testify as to Smith's nervousness (describing him as compliant, and not offering much eye contact but describing the stop as average), nor did she relate being advised by Asberry to keep an eye on him because of his nervousness, as Asberry testified he told her.  [*Id.* at 7].

Smith also argues that Asberry testified inconsistently and contrary to Sutherland on critical events.  First, he points out that Asberry testified that when he arrived, Sutherland was speaking with Smith, so Asberry took up his position near the passenger side of the Malibu, but that Sutherland testified that Asberry appeared when she was writing out the citation in her patrol vehicle.  [*Id.* at 8].

Second, he notes that Asberry testified that Sutherland interrupted her interaction with Smith and conferred with Asberry at the rear of the Malibu, and that at that time Sutherland told Asberry that she smelled marijuana and he explained to her that cigarettes are used to mask the odor of marijuana.  However, Sutherland described Asberry's cigarette-smoke statement as being made upon Asberry's arrival and without any prompting and comments by her.  In addition, Sutherland did not testify as to any further conversations with Asberry about marijuana smell even after she detected it.  [*Id.* at 9, 17 (citing T43)].

18

Third, he points out that Asberry testified about telling Sutherland to be wary of Smith because of his nervousness, but Sutherland did not testify about any such nervousness or warning from Asberry. [*Id.* at 9-10, 17-18, 19].

Besides arguing that Asberry's testimony contradicted Sutherland, Smith also argued that Asberry's testimony contradicted Asberry's own testimony. Specifically, Smith points out that on re-cross-examination, Asberry testified that he did not smell marijuana until he went to Defendant's side of the Malibu, contradicting his direct and re-direct examination testimony that he first smelled marijuana while at Durden's side of the Malibu. [*Id.* at 12]. Smith also notes that Asberry's testimony is further suspect because he claimed that after being given the citation, Smith was free to leave the scene and no contrary instructions were given to him (*see* T72-73), even though by that point, at least one of the officers claimed to have smelled marijuana. [Doc. 27 at 11, 22].

Smith also argues that the Court should credit Durden's testimony as accurately reflecting the encounter between the officers and Smith. [*Id.* at 23]. Specifically, Durden testified that, without the officers switching sides, Asberry asked Smith if he had any drugs or weapons in the car, and when Smith stated there were none, Asberry asked if he was sure and would he mind, then, if Asberry checked since he was saying that nothing was in the car. T81, 87. Smith responded that he did not consent to a

19

search, after which Asberry stated "I think I smell some marijuana, so you sure I can't search?  You sure you don't want me to search?"  T82; *see also* T87-88.  Durden testified that after that, Asberry stated that if Smith did not consent, he would call a drug dog.  T82.

In reply, the government argues that despite some differences in the officers' testimony, which the government argues is to be expected, the totality of circumstances supports a conclusion that the officers smelled marijuana and thus had probable cause to search the vehicle.  [Doc. 28 at 1-2].  It points to several cases where judges' credibility determinations were upheld against arguments that the officers' testimony lacked credibility, [*id.* at 4-5 (citations omitted)], and cites to this Court's R&R in *United States v. Gonzalez*, Criminal Action File No. 1:09-CR-00371-TWT/AJB, 2010 WL 2721882, at *6-8 (N.D. Ga. May 25, 2010) (R&R), *adopted* 2010 WL 2721540 (N.D. Ga. July 7, 2010), where the police officer's testimony was found credible although it contained inconsistencies.  [Doc. 28 at 5].  It argues that despite the inconsistencies, among the uncontroverted facts is the officers' smelling of marijuana, which gave rise to probable cause.  [*Id.* at 6 (citing T8, 16, 21,

20

28, 33, 35-36, 38, 49-50, 72) & n.3].[20]  The government also argues that it cannot be said that the officers' testimony was contrary to the laws of nature or was so exceedingly improbable on its face that no factfinder could believe it.  [*Id.* at 7 (citing *United States v. Bergin*, 455 Fed. Appx. 908, 909-10 (11th Cir. Jan. 12, 2012); *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002))].

## IV.   *Discussion*

### A.   *Applicable Law*

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy. U.S. Const. amend. IV; *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Place*, 462 U.S. 696, 706-07 (1983).  Accordingly, a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location.

---

[20]     The government also argues that the search was lawful because the drug dog alerted and marijuana ultimately was found in the vehicle, but neither of those facts address whether the government established reasonable suspicion to prolong the traffic stop in the first place, and of course, the validity of the search is not dependent upon what it reveals.  *Bumper v. North Carolina*, 391 U.S. 543, 548 n.10 (1968) (search not justified by what it turns up); *United States v. Di Re*, 332 U.S. 581, 595 (1948) ("We have had frequent occasion to point out that a search is not to be made legal by what it turns up. . . .  In law it is good or bad when it starts and does not change character from its success.") (footnote omitted).

AO 72A
(Rev.8/8
2)

*Skinner v. Ry. Labor Execs' Ass'n*, 489 U.S. 602, 619 (1989); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). " '[S]earches conducted outside the judicial process . . . are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions.' " *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted)); *see also United States v. Campbell*, 920 F.2d 793, 795 (11th Cir. 1991) ("A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law.").

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. The [g]overnment must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted). The burden to establish the application of the warrant exception is by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.") (citing *Lego v. Twomey*, 404 U.S. 477, 488-89

22

(1972)).  A preponderance of the evidence simply means an amount of evidence that is enough to persuade the Court that the existence of a fact is more probable than its non-existence.  *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997); *see also United States v. 4 Meadowbrook Lake Condominium, Unit 308, Condominium # 8, Located at 314 SE 10th Street, Dania, Florida 33004*, No. 06-60079-CIV-COHN/SNOW, 2007 WL 809681, at *3 (S.D. Fla. Mar. 15, 2007) ("A preponderance of the evidence means that the United States 'must present an amount of evidence sufficient to persuade the court that the claim or contention is more likely true than not true.' ") (citing Eleventh Circuit Pattern Jury Instructions, Civil (2000), Basic Instruction 6 .1, Burden of Proof).

In *Carroll v. United States*, 267 U.S. 132, 153 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles.  Under the "automobile exception,"[21] "[i]f a car is readily

---

[21]    The term "automobile exception" is somewhat of a misnomer, since the Supreme Court has expressly stated that there is "no general 'automobile exception' to the warrant requirement."  *South Dakota v. Opperman*, 428 U.S. 364, 382 (1976). Rather, this term of art is better understood as simply embracing the now-settled doctrine that it is permissible to conduct a warrantless search of an automobile and any containers found therein, provided that, at the time of the search, there is probable cause to believe that contraband is secreted at some unspecified location within the automobile.  *California v. Acevedo*, 500 U.S. 565 (1992); *United States v. Ross*, 456 U.S. 798 (1982).  Of course, if the police have probable cause to believe that

AO 72A
(Rev.8/8
2)

mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *see also United States v. Virden*, 488 F.3d 1317, 1321-22 (11th Cir. 2007) ("[T]he search and seizure of vehicles without a warrant is permissible when the police have probable cause to believe a vehicle contains contraband.") (citations omitted). No separate exigent circumstances need to be shown. *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999). The validity of the search turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime. *Id.*[22]

A traffic stop must last "no longer than is necessary to effectuate the purpose of the stop," and "the scope of the detention must be carefully tailored to its underlying justification." *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999) (quotations and alteration omitted). "Ordinarily, when a citation or warning has been issued and

---

contraband is located in a specific area of the automobile, then a warrantless search of other portions of the automobile is impermissible. *See Arkansas v. Sanders*, 442 U.S. 753 (1979).

[22]    Probable cause for a search exists when under the totality of the circumstances "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002).

24

all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled." *United States v. Simms*, 385 F.3d 1347, 1353 (11th Cir. 2004). Because a traffic stop " 'is more analogous to an investigative detention than a custodial arrest . . . [the Court] analyze[s] the legality of these stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1[] (1968).' " *United States v. Gonzalez*, 275 Fed. Appx. 930, 932 (11th Cir. May 2, 2008) (quoting *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citations omitted)). Accordingly, " 'an officer's actions during a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *Id.* (quoting *Purcell*, *id.*, and *Terry*, 392 U.S. at 20). An officer's prolonging of a traffic stop beyond its initial purpose is only reasonable in the limited circumstances where there is "an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring," or if the driver consents. *Pruitt*, 174 F.3d at 1220.

Moreover, while " '[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment,' " *Gonzalez*, 275 Fed. Appx. at 933 (quoting *Illinois v. Caballes*, 543 U.S. 405, 410 (2005)), "a Fourth Amendment violation *would* occur if police conducted a dog sniff and

25

uncovered contraband while an individual was unlawfully detained, e.g. 'during an unreasonably prolonged traffic stop[.]' " *See Gonzalez*, *id.* (quoting *Caballes*, 543 U.S. at 407-08) (emphasis in *Gonzalez*).

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *Ramirez-Chilel*, 289 F.3d at 749. A court, as fact finder, evaluates the credibility of a witness by considering, *inter alia*, the internal consistency of the witness's testimony, the witness's candor, the witness's demeanor on the stand, and the interests of the witness. *See id.*; *see also Gallego v. United States*, 174 F.3d 1196, 1198 (11th Cir. 1999); *United States v. Gamory*, No. 1:08-cr-153, 2009 WL 855948, at *11 (N.D. Ga. Mar. 30, 2009) (Thrash, J., *adopting* Vineyard, M.J.); *United States v. Wein*, No. Crim. 05-317, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand"). A reviewing court will defer to "the magistrate judge's credibility determinations unless his understanding of the facts appear to be 'unbelievable,' "

i.e., the magistrate judge's credibility determination "is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Ramirez-Chilel*, 289 F.3d at 749 (citation omitted).

### B.   Analysis

The issue in this case is whether the government proved that the officers smelled marijuana emanating from Defendant's automobile either during or immediately after detaining him for a traffic violation, sufficient to prolong the stop in order (1) for a drug detection canine to be dispatched to the scene, and (2) to remove Smith from his vehicle, which actions resulted in discovery of the firearm and, ultimately, the controlled substances which form the bases of the charges in this case. The Court concludes that the government has not satisfied its burden.

As noted, the government bears the burden of showing that it is more likely than not that the officers smelled marijuana. However, each government witness testified inconsistently as to when marijuana was first smelled. First, Sutherland went back and forth about when she first smelled marijuana. Although she mainly stated that it was during the course of speaking with Smith prior to the conclusion of the citation process, she also testified that she did not smell marijuana until she had completed the traffic citation process and had given Smith his copy of the citation. The government did not

27

attempt to explain this direct inconsistency, except by arguing that inconsistencies between the two officers' testimony could be expected. However, in this case, it is not just Sutherland's testimony differing with Asberry's; it is Sutherland's testimony differing with other portions of Sutherland's testimony. Obviously, if Sutherland smelled marijuana while the traffic stop was ongoing, then she was justified in continuing the initial detention at least temporarily until her suspicions were either confirmed or dispelled. *United States v. Garcia-Aleman*, No. 1:10-CR-29, 2010 WL 2635071, at *1 (E.D. Tex. June 9, 2010), *adopted by* 2010 WL 2635073, at *1 (E.D. Tex. June 30, 2010) ("[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been dispelled or confirmed.") (citations omitted). If, on the other hand, she smelled it after the traffic stop was concluded, i.e., after she handed the signed citation to Smith, then the Court would employ different analysis, that is, whether there was reasonable suspicion justifying the additional detention. The government essentially asks the Court to pick one, because under either scenario the officer could continue to detain Smith, but it does not offer an explanation for the inconsistency in Sutherland's testimony. Thus, the Court is left wondering whether Sutherland smelled marijuana at all. Since the

28

government has the burden of establishing the facts and establishing that the warrant exception applies, the Court is unwilling to accept such inconsistencies as satisfying the government's burden.

A number of other facts also support the Court's rejection of Sutherland's testimony. First, she testified that Asberry told her, unprompted by any other discussion with him or comment she made, that cigarette smoke is commonly used to mask the odor of marijuana. Simply stated, that testimony did not make sense. While Asberry testified that he told Sutherland about the odor-masking effect of cigarette smoke after he claimed to have smelled marijuana, he did not testify that his comment to Sutherland was unprompted. Sutherland's testimony on this point leads the Court to skeptically evaluate other portions of Sutherland's testimony, which was based on her memory of the sequence of important events during the traffic stop. While the Court can, as argued by the government, expect certain inconsistencies to occur between even the most trustworthy and straightforward witnesses, Sutherland's recollection of the circumstances of when Asberry told her about the use of cigarette smoke to mask marijuana odors simply did not ring true.

Second, a number of direct questions to Sutherland were answered in an unnecessarily indirect manner, causing the Court to suspect that she was giving evasive

29

answers.  For example, the Court tried to determine whether Sutherland's reason for performing the traffic stop on the Malibu was limited to the suspended registration, which called for a "yes" or "no" answer.  The Court received a "no" answer only after asking three questions:

> The Court: So prior to running the tag you had no suspicion one way or the other, this was -- was this just a random run of the tag?
>
> [Sutherland]: *Overall that would be correct to say, yeah.*
>
> The Court: Had you observed Mr. Smith commit any traffic offenses prior to you deciding to run the tag?
>
> [Sutherland]: *I do not recall him violating any traffic offenses prior to me running the tag.*
>
> The Court: Did you have any other information about Mr. Smith prior to the time that you decided to run his tag?
>
> [Sutherland]: No.

T42 (emphasis added).  The italicized answers were deemed by the Court at the time they were given as not forthcoming, at best.  The first two questions called for "yes" or "no" answers, and giving due regard to the stilted formalistic way some police officers testify, the Court formed the distinct impression that the whole truth was not being asserted.

30

Third, while the above example suggests that Sutherland was giving hypertechnical nuanced responses to direct questions, the Court is also concerned by other instances in Sutherland's testimony that reflect a lackadaisical approach to accuracy. Besides her inconsistent testimony about when she first smelled marijuana, Sutherland appeared not to be bothered at all by first testifying that she asked Smith for consent, but then, upon being shown her report, acknowledging that Asberry asked Smith for consent. T9, 37. The Court is aware that it is not uncommon for witnesses to be impeached by their earlier written statements or prior testimony due to either the passage of time, a simple mistake or confusion. Like Sutherland's inconsistent testimony about when she first smelled the marijuana, however, her manner of testifying on this point struck the Court as not trying to offer accurate and truthful testimony despite the passage of time, but simply casually throwing out answers and not giving her testimony, and the oath that preceded it, the sanctity its deserved.

Fourth, as noted *supra* n.5, Sutherland wrote in her post-arrest report that she observed a scale in the Malibu when she first approached it. *See* Govt. Ex. 8. While the Court initially viewed Sutherland's failure to describe that critical piece of evidence as an oversight either of the witness or government counsel, on cross-examination, Sutherland acknowledged that she looked in the vehicle for contraband in plain view

31

and denied seeing any.  This significant omission from her testimony after being included in her post-arrest narrative also causes the Court to question the accuracy of her recollection and her post-arrest report.

Fifth, Sutherland did not testify either that Smith exhibited any level of nervousness (slight, mild, extreme), nor did she recount that Asberry told her to be wary of him because he was nervous.  The events as proffered by the government's theory of the case certainly would have given Sutherland a much greater opportunity to observe Smith's demeanor and attitude, but she described Smith as compliant and the traffic stop as average.

Thus, the Court cannot state that the government established when, or if, Sutherland smelled marijuana sufficient to prolong the traffic stop.

The Court now turns to Asberry's testimony.  Like Sutherland, his testimony about when he first smelled marijuana was inconsistent.  He testified—the majority of the time—that he smelled marijuana for the first time while at Durden's side of the Malibu after her cigarette was extinguished.   However, he also clearly and unambiguously testified that he smelled marijuana the first time when he switched sides with Sutherland and was on Smith's side of the car, only to take it back when shown his post-arrest written narrative.  T69-70.  Again, the government attempts to justify

this inconsistency as one to be expected, but its argument goes to inconsistencies in testimony between multiple witnesses, not a single witness. Further, the government did not seek to have Asberry explain this inconsistency, nor does the government offer a compelling argument why the Court should ignore it. Moreover, Asberry did not clearly describe for the Court conversations that he had with Sutherland. *See infra* at 14.

In addition, the Court views the officers' testimony skeptically due to the differences in the way they describe Smith's demeanor. As noted, Sutherland did not testify that Smith was overly nervous or that Asberry warned her of Smith's nervousness, contrary to Asberry's testimony. Instead, Sutherland described Defendant as compliant and the stop as average. The Court recognizes that two witnesses can have different perspectives even from the same vantage point, but the government did not explain this inconsistency in its witnesses' testimony.

The government's citation to Eleventh Circuit cases upholding magistrate judge or district judge credibility determinations are not instructive here. The undersigned's Report and Recommendation in *Gonzalez*, 2010 WL 2721882, is helpful, but not in the manner in which the government seeks. In *Gonzalez*, the defendant attacked a search warrant affiant's credibility. *Id.* at *6. The Court found the affiant officer to be

33

credible because the information he relayed in his affidavit, as well as his testimony at the hearing, was based on information conveyed to him through officers at the scene of the investigation, through an intermediate officer, resulting in the "real life counterpart to the telephone game." *Id.* at *7-9.

In the current case, the Court is not entirely discounting the officers' credibility based on inconsistencies between their respective testimony. With the exception of the contradiction between Sutherland and Asberry as to Smith's nervousness and when Asberry commented about the masking effect of cigarette smoke, the Court's overarching concerns are the internal inconsistencies in each officer's own testimony, and the lack of any explanation as to the reasons for those inconsistencies.[23]

The Court recognizes that Durden acknowledges that Asberry stated to Smith and her that he smelled marijuana and that was why he wanted to search the vehicle. That testimony offers some corroboration that the officers did in fact smell marijuana at the time, but Durden also testifies that the marijuana smell was not brought up until after Smith was asked whether there were drugs in the car and denied consent to search it.

---

[23]   The Court notes that one possible reason for Sutherland's testimonial lapses was the lack of time to prepare her since she had just flown in from Dallas. T34. The government did not offer that excuse, nor would that justify inconsistent answers under oath.

AO 72A
(Rev.8/8
2)

T81-82.  Given the inconsistencies in Sutherland and Asberry's testimony noted above,

this testimony is not sufficient to satisfy the government's burden.  Moreover, the fact

that Asberry may have made this statement to Smith and Durden does not necessarily

mean that he in fact smelled the marijuana.[24]

    As a result, the Court concludes that the government did not satisfy its burden

to show that the officers has reasonable suspicion to prolong the traffic stop beyond the

---

[24]    The Court also does not rely on Defendant's argument that the marijuana
seized was too small a sample for the officers to be able to smell it.  First, the size of
the marijuana sample in this case—sixteen grams—is not so small so as to make a
claim that it gave off an odor contrary to natural laws or totally unbelievable.  The
Court can envision scenarios that would render comparably-sized samples readily
detectable by smell, depending on how securely the sample was wrapped, how long it
had been in the vehicle and whether the sample had been recently fully or partially
unwrapped while in the vehicle, whether the marijuana sample was "fresh" or "stale,"
whether the strain of marijuana had a pungent odor, etc.  Given all of these factors,
without expert testimony, the Court cannot state that it was impossible for someone to
smell the sixteen grams of marijuana in this case.

    Second, Defendant's argument relies on what ultimately was discovered, which
is an improper basis for resolving Fourth Amendment issues.  *Bumper*, 391 U.S. at 548
n.10 (search not justified by what it turns up); *Di Re*, 332 U.S. 581, 595 (1948) (same);
*Byars v. United States*, 273 U.S. 28, 29 (1927) ("A search prosecuted in violation of the
Constitution is not made lawful by what it brings to light[.]"); *Pace v. Beto*,
469 F.2d 1389, 1391 (5th Cir. 1972) ("The legitimacy of a search must be judged at its
inception.") (citing *Di Re*, 332 U.S. at 595).  While in the appropriate case, the
discovery of a very small sample of marijuana might call into question whether
testimony about being able to smell it violates natural law, and thus allow the Court to
in fact consider what was seized in analyzing the propriety of a search, the Court is
unwilling to engage in that analysis in this case.

time necessary to deal with investigating the suspended registration, because the Court does not find credible the officers' testimony about smelling marijuana.

The government proffers no reason other than the preparation for the drug detection dog's arrival in support of removing Smith from the vehicle and frisking him. Thus, since the government did not satisfy its burden of showing reasonable suspicion that the officers smelled marijuana sufficient to continue to detain Smith for the drug detection dog's arrival, Smith's removal from the vehicle, his pat down and the discovery of the firearm do not provide independent grounds for the search of the Malibu.

"To justify a patdown of the driver or a passenger during a traffic stop, . . . , just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Even if the Court credits the evidence that Smith was overly nervous, courts have found that mere nervousness is insufficient to justify a *Terry* detention, much less a frisk for weapons. *United States v. Spinner*, 475 F.3d 356, 360 (D.C. Cir. 2007) ("[T]he suspicion that someone is armed . . . must be based upon something more than his mere nervousness. A person stopped by the police is entitled to be nervous without thereby suggesting he is armed

36

and dangerous."); *United States v. McKoy*, 428 F.3d 38, 41 (1st Cir. 2005) ("It is simply not reasonable to infer that a driver is armed and dangerous because the officers believe that he appears nervous and reaches toward the car's console when approached by police, even in a high-crime neighborhood."); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) ("Nervous behavior, standing alone, is not enough to justify a *Terry* search."), *abrogated on other grounds by United States v. Burton*, 334 F.3d 514, 517 (6th Cir. 2003); *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999) ("Nervousness or refusal to make eye contact alone will not justify a *Terry* stop and pat-down . . . , but such behavior may be considered as a factor in the totality of circumstances."); *United States v. Sanchez*, 408 F. Supp. 2d 1255, 1258 (S.D. Fla. 2005) ("[E]vidence of nervousness alone is insufficient to detain a driver."). *Cf. United States v. Harris*, 313 F.3d 1228, 1236 (10th Cir.2002) (noting that while defendant's nervousness alone was not enough to justify the frisk, emphasizing that defendant refused to take his hands out of his pockets when asked, giving the officer a reasonable justification for believing that he was armed and dangerous). As a result, in the absence of credible evidence that the officers smelled marijuana, Smith was not properly subjected to a pat down for weapons. Further, without credible evidence that

AO 72A
(Rev.8/8
2)

the officers smelled marijuana, there was no justification for continuing the detention until the drug detection canine arrived.

## V.    *Conclusion*

For all the reasons stated above, the undersigned **RECOMMENDS** that Smith's motion to suppress evidence, [Doc. 13], be **GRANTED**.  Having disposed of all matters referred to the undersigned, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO ORDERED, RECOMMENDED AND CERTIFIED**, this the 24th day of April, 2014.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

38